IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

ANTHONY GOFF                                                                                    PLAINTIFF

vs.                                         CASE NO. **3:08CV00015BSM**

STANDARD INSURANCE COMPANY,
NUCOR CORPORATION and NUCOR
EMPLOYEE BENEFIT PLAN                                                                DEFENDANTS

## **ORDER**

Plaintiff Anthony Goff (Goff) filed this complaint against Defendants pursuant to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, alleging that his long term disability (LTD) benefits were wrongfully terminated. The parties have filed briefs on the Administrative Record and the case is ready for disposition.

I.  BACKGROUND

Goff worked as a Yard Engineer, also known as an Industrial Locomotive operator, for Nucor Corporation until December 15, 2004. He was a participant in an employee benefit plan (Plan) provided by Nucor Corporation to its employees. The Plan is insured by Standard Insurance (Standard) and administered by Nucor.

A.      Plan Provisions

The Plan provides LTD benefits to eligible employees. Under the Plan, participants are entitled to benefits for disabilities "due to accidental injury, physical disease, mental disorder, substance abuse or pregnancy." (AR 17).[1] The Plan provides for monthly benefits equal to 50

---

[1] In accordance with the court's ERISA Scheduling Order, the parties filed a Stipulated Administrative Record with Bates Numbering STND1184-00001 to STND 1184-01421.

percent of an insured's monthly predisability earnings after a 90-day waiting period. (AR 11-12). For the first twelve months, plan participants are entitled to LTD benefits if they are unable to perform the material duties of their own occupation. (AR 11, 15-16). After the 12-month period, a participant is entitled to continued LTD benefits if the participant is disabled from the material duties of any occupation. (AR 11, 16). The Plan further provides that payment of LTD benefits is limited to 24 months for a disability caused by or contributed to by mental disorders. (AR 25). A mental disorder is defined as:

> any mental, emotional, behavioral, psychological, personality, cognitive, mood or stress-related abnormality, disorder, disturbance, dysfunction or syndrome, regardless of cause ( including any biological or biochemical disorder or imbalance of the brain) or the presence of physical symptoms. Mental Disorder includes, but is not limited to bipolar affective disorder, organic brain syndrome, schizophrenia, psychotic illness, manic depressive illness, depression and depressive disorders, anxiety and anxiety disorders.

(AR 25).

B.      Factual Background

*1. Physical Injuries*

On December 15, 2004, the locomotive Goff was operating struck the right side of a tractor trailer attempting to run through the railroad intersection while the lights, bar and claxon were in operation. Goff jumped from the train and either struck the wheels and axle of the truck or the truck ran over him. He suffered severe injuries and was airlifted to the Regional Medical Center at Memphis, also known as the MED. He was 47 years old at the time. Goff remained at the MED until December 22, 2004 when he was transferred to HealthSouth Rehabilitation Hospital in Jonesboro, Arkansas,

---

References to the Administrative Record are "AR" and the last three or four digits of the Bates number.

where he stayed until January 5, 2005.

While at HealthSouth Goff received comprehensive inpatient rehabilitation. (AR 731). Dr. Terence P. Braden, III, a doctor of osteopathy, was in charge of Goff's rehabilitation program. Treatment included extensive assessments, and therapies for his physical injuries. Goff was discharged from HealthSouth with diagnoses of multiple trauma secondary to motor vehicle accident, L1 to L5 transverse process fractures; T10 to T11 spinous process fractures; left 9th through 12th rib fractures; left psoas hematoma; gait instability; activity of daily living skills deficits; gastroesophageal reflux disease; constipation; mental status changes, resolved; pain, controlled; significant anemia, improved; and closed head injury. (AR 730). He was discharged to his home in stable condition and was to receive outpatient physical and speech therapy

After leaving HealthSouth, Goff was seen by a number of physicians for his physical injuries. He first saw Dr. Riley Jones, an orthopedist, on January 6, 2005. (AR 705). Dr. Jones recommended physical therapy and further diagnostic studies, including MRIs of his elbow, brain, and lumbar spine.

Dr. John D. Brophy, a neurosurgeon, treated Goff for his back and shoulder problems from February 17, 2005 to July 26, 2005. (AR 1213, 1254). When Dr. Brophy first examined Goff he agreed with Dr. Jones that surgical intervention was not warranted. He suggested that Goff initiate a therapy/exercise program when cleared by Dr. Jones and that he slowly progress with his activities. (AR 1256).

Goff returned to Dr. Brophy on July 26, 2005, complaining of low back pain extending into the left buttock. (AR 712-714). Dr. Brophy found that Goff had "[l]umbar myofascial pain syndrome status post lumbar transverse process fractures and thoracic spinous process fractures as well as left SI diastasis without clinical evidence of radiculopathy or radiographic evidence of nerve root

compression." Dr. Brophy stated that there was no indication for surgical intervention and from a neurosurgical standpoint, no objective reason why Goff could not be cleared to return to work at full duty without restriction. (AR 714). Therefore, on July 26, 2005 Dr. Brophy cleared Goff to return to work at full duty without restriction from a neurosurgical standpoint, but noted that his return to work was complicated by psychological issues being treated by Dr. Johnson. (AR 1178).

Dr. Feiyu Chen, a neurologist, examined Goff for memory loss and headaches on March 17, 2005. He found all tests to be unremarkable and thought that Goff was neurologically stable. (AR 611-612).

Dr. Jones treated Goff from January, 2005 to July, 2005. Dr. Jones performed arthroscopic surgery on Goff's left shoulder on May 11, 2005. (AR 674). After that, Goff restarted physical therapy. On July 8, 2005, Dr. Jones found that Goff had full range of motion in his elbow, and unrestricted motion of his shoulder. He stated that from an orthopedic standpoint, Goff should be able to return to work. (AR 667). Dr. Jones notified Standard that Goff was released from his care as of July 26, 2005. (AR 1223).

Dr. Braden continued to provide treatment to Goff. On July 13, 2005, Dr. Braden noted that Goff continued to complain of "ongoing discomfort in all parts of his body . . ." but "[t]hat from a physical medicine rehabilitation standpoint, there" was nothing further that Dr. Braden had to offer Goff. Dr. Braden thought that Goff would be best served by psychiatric input to find medications to help with his anxiety and depression. (AR 637)

In July, 2005, Goff went to work hardening treatments at HealthSouth Rehabilitation Center of Paragould, Arkansas. In a July 25, 2005 summary of the seven treatments, Stephanie Privatt, a physical therapist, noted that Goff could not complete an entire four hour session, and that he complained of pain

in the lower extremities. The therapist felt that Goff was "very self-limiting in all the tasks that he faces," and that she had done as much as Goff was going to allow her to do. (AR 619).

Dr. Jones referred Goff to Debbie A. Robertson, OTR/L, ABDA, for a functional capacity evaluation (FCE) which was performed on September 1, 2005. (AR 575-582). She found that Goff had the physical capacity to occasionally lift/carry 20 pounds and to frequently lift/carry 10 pounds. Goff did not present any restriction or limitations that would impede his ability to sit, walk, stand, climb stairs or ladder, balance, stoop, bend, kneel, crouch and reach in an unrestricted manner. She remarked that Goff reported increased pain in his low back region with repetitive stooping, bending, ladder climbing and stair climbing. (AR 581). Based on her evaluation, Robertson found that Goff displayed the physical capacities to perform his pre-injury job duties in an unrestricted manner. "His psychometrics are considered poor and indicative of an individual who perceives himself as having a significant level of disability." Robertson did not feel that further therapeutic intervention would provide Goff with any significant benefit. (AR 581).

In his physician's report to Standard dated October 25, 2005, Dr. Jones noted that Goff was able to continuously sit, stand, walk, balance, bend, kneel, crawl, climb stairs and ladders, reach at and above shoulder level and drive. He found that Goff could lift and carry 21 to 50 pounds continuously and push or pull 51 to 75 pounds continuously. (AR 1222).

Goff was referred to Jim Keller, PhD., a physical therapist, for pain management. Dr. Keller treated Goff from January 17, 2006 to April 17, 2006. (AR 527-553). In a narrative report dated March 23, 2006, Dr. Keller stated that Goff could not meet any of the standards of lifting, carrying, walking or climbing that are required of his job description as a locomotive conductor. Dr. Keller stated that as a result of his traumatic injuries, post traumatic stress and his emotional behavior, Goff was

permanently disabled from his job as a locomotive conductor.  He recommended that Goff start a new vocation that would be free of sitting, standing, or driving.  (AR 535-536).

On April 27, 2006, Dr. Phillip Green of the Mid-South Pain and Anesthesia Clinic found that Goff continued to have upper and lower extremity pain as well as low back pain.  His impressions included: cervical spondylosis, lumbar spondylosis, chest wall pain, lumbar radicular pain, cervical pain and primarily Post Traumatic Stress Disorder.  Dr. Green stated that Goff was basically at his MMI but that he would need continued medical maintenance therapy.  (AR 521-522).

*2. Mental Disorders*

Goff began experiencing psychological problems soon after his injury. While at HealthSouth Goff was referred by Dr. Braden to Dr. Dan Johnson, a clinical neuropsychologist. (AR 1036).  At that time, Dr. Johnson found that Goff had problems with attention and concentration, poor short term memory, and acute stress reaction that caused some mood and behavior problems as well as some cognitive problems.  (AR 571-573).

Goff was referred to Suzanne Gibbard, a psychologist, by his attorney.  Dr. Gibbard evaluated Goff on February 23, 2005 and administered a number of tests.  She found that Goff was experiencing Posttraumatic Stress Disorder (PTSD) and that the possibility of a cognitive disorder due to the head trauma needed to be ruled out.  She recommended that Goff have a neuropsychological evaluation to determine the extent of his cognitive deficits as well as a psychiatric evaluation to delineate his mood difficulties.  She opined that Goff would benefit from individual psychotherapy for an extended period of time.  (AR478-488).

Goff returned to Dr. Johnson in March, 2005.  Dr. Johnson observed that Goff had "significant amounts of mixed anxiety and depression."  He noted that Goff's emotional/behavior status had

worsened significantly since his discharge from HealthSouth. He could not identify whether Goff's delayed memory, impaired ability to manipulate and process information, and impaired language abilities were attributable to a closed-head injury or post-concussive disorder, or some other source. (AR 1185-1186).

Goff saw Dr. Johnson on a weekly basis beginning in July, 2005. Dr. Johnson evaluated Goff on October 5, 2005. Dr. Johnson believed that Goff was not able to return to work because of significant emotional/behavioral adjustment issues secondary to the injury. Dr. Johnson had the goal of having Goff return to work within the next three months, by a gradual "ease in" period. (AR 1184). Goff did not return to work within the three months but continued to have mental health issues as well as pain.

In September, 2005, on recommendation from Dr. Johnson, Goff met with Dr. Ali Hashmi, a psychiatrist at Mid-South Health Systems. He diagnosed Goff with Post-Traumatic Stress Disorder, chronic, severe; Major Depressive Disorder, moderate without psychotic features; Anxiety Disorder, NOS, and Alcohol Abuse, in early remission. (AR 425-426). He prescribed antidepressant medication.

Goff was treated at Mid-South Health Systems for PTSD and severe depression from December 7, 2005 to August 10, 2006. (AR 388-389). For most of 2006, Goff saw Mary Wegner, M.D., a psychiatrist at Mid- South. In a report dated May 17, 2006, to Goff's psychiatrist, Dr. Johnson stated that following the traumatic injury, Goff developed PTSD . Dr. Johnson described Goff's case as "PTSD with co-morbid low-mid severe depression and generalized high moderate anxiety, complicated by physical injury/limitations, chronic pain, sleep deprivation, change/loss/alteration of vocation, and overall adverse impact on quality of life." (AR 560).

In a letter dated August 10, 2006, Dr. Wegner remarked that the severity of Goff's PTSD

complicated his recovery from depression. Additionally, his high levels of pain contributed to the depression. She opined that Goff was not at his maximum medical improvement and she had no reasonable way of predicting when he would get to that point. (AR 388-389).

At the request of Goff's counsel, Goff was evaluated by Dr. Dale Halfaker, a neuropsychologist. Dr. Halfaker evaluated Goff on March 25, 2005 and then reevaluated him on September 18, 2006. (AR 583-609). Goff continued to have a number of somatic complaints and to experience pain, particularly in his lower back. (AR 590). Dr. Halfaker administered a number of tests. He concluded that brain injury related neuropsycholgoical dysfunction was not present as a result of the December 15, 2004 accident but that Goff was experiencing significant emotional problems in the form of PTSD and depression "that are referable to this accident and the physical injuries resulting in pain that he experienced in the 12/15/2004" collision. (AR 607). Dr. Halfaker believed that "with the combination of his PTSD, major depression, chronic pain, and alcohol abuse" Goff was not "employable within the open, competitive labor market on a full time basis." Dr. Halfaker gave Goff an impairment rating of 45 to 50% of the person as a whole related only to his psychological conditions. (AR 608).

Goff was also evaluated by Dr. Gary T. Souheaver, a neuropsychologist, on October 4, 2006. (AR 733-738). He found that Goff's problems, as shown by the results of certain testing, were not consistent with a diagnosis of closed head injury. He opined that Goff's orthopedic, medication and psychiatric factors were most likely related to Goff's complaints and symptoms rather than to traumatic brain injury. (AR 738).

### 3. Vocational Assessments

On February 21, 2006, Bob White, MSE, a vocational specialist, evaluated Goff's ability to return to work. Based on his interview with Goff and his review of the medical information, White

believed that Goff would not be able to physically return to his job as a locomotive engineer. White noted that Goff had continued limitations in all of the primary strength activities as well as postural stress and related movements. Goff's pain, according to White, continued to be an issue related to any physical activity and his ability to 'make it through' on a day to day basis. (AR 1286-1287). He doubted that Goff had "much chance of returning to the work force in any capacity if his physical and emotional status" did not improve. He believed that Goff's prognosis for improvement was poor. (AR 1287).

White subsequently reviewed Dr. Halfaker's neuropsychological assessment, Robertson's FCE, Dr. Keller's physical assessment and an EMG report. (AR 1277). In his April 30, 2006 report White noted that Goff's job requires him to work twelve hours a day, which was not considered by Robertson. He also remarked that should Goff develop chronic pain syndrome, as suggested by Dr. Halfaker, he may not be able to return to work. White further observed that Goff has a problem concentrating and staying focused on any subject for more than 10 to 15 minutes. He did not show that he could meet any standards of lifting, carrying, walking or climbing that are required of his job description as a locomotive conductor.

White noted that a nerve conduction and EMG report dated January 24, 2005, found evidence of left cervical polyradiculopathy, most likely at the C6 and C8 levels and evidence strongly suggestive of a left L5 lumbosacral radiculopathy. White stated:

> The neuropsychological assessment of Dale Halfaker, physical assessment from Jim Keller, and objective findings of the nerve conduction studies and EMG are much more in line with 1) my observations of Anthony Goff during my personal interview with him, 2) Mr. Goff's reported limitations and restrictions, 3) his diagnosis and treatment to date, 4) my professional knowledge of the job duties of a locomotive engineer. His test findings are significant vocationally in that they document a basis for the chronic pain complaints of Mr Goff and again, in and of itself, could preclude a return to work in any capacity.
>
> At this time I don't' believe Anthony Goff will ever be able to return to his past relevant

    work as a locomotive engineer; he is approximately 18 months out from his injury, and while he may be able to return to some type of employment in the future other vocational options are limited at this time.

(AR 1278).

White met with Goff again on September 1, 2006. He reviewed a life care plan prepared by Carl L. Bartlow, Ph.D.; reports of Drs. Jim Keller and Stephen Smith; EMG clinic records; Mid-South Health Systems records dated June, 2006; and other documents. In his September 7, 2006 letter to Goff's counsel, he concluded, based on his interview and record review, that Goff's status vocationally had remained unchanged. "Emotionally and psychologically his records indicate he is not making much improvement and his depression and PTSD continue to be major barriers to return to work. " There was no change in terms of pain, and perhaps some deterioration. (AR. 1273).

### 5. Claims History

Goff submitted his application for LTD benefits on April 5, 2005. (AR 340-341). He was approved on April 13, 2005. (AR 332). As noted above, a plan participant is entitled to LTD benefits if he is unable to perform the material duties of his own occupation. (AR 11, 15-16). To continue receiving benefits beyond the year, a participant must be disabled from the material duties of any occupation. (AR 11, 16).

Standard paid Goff's LTD claim through March 14, 2006, the end of the 12-month period. Standard, however, first informed Goff on December 28, 2005, that the 24-month limit on benefits for disabilities "caused or contributed to" by a mental disorder would apply to his claim and therefore his benefits would cease March 14, 2007. (AR 229-230). He was reminded again on November 21, 2006. (AR 217-18).

Standard determined that Goff was able to perform light work as of March 14, 2006. Standard,

however, also determined that Goff remained disabled after March 14, 2006, due to his mental disorders. Therefore, Standard applied the policy provision based on disabilities for mental disorders and informed Goff that his claim for disability benefits based on his mental disorders was limited to 24 months, and would close with payment through March 14, 2007. In a letter dated December 28, 2006, Goff's counsel sought review of the decision to terminate Goff's LTD benefits on March 15, 2007. (AR 148-150).

Standard referred the case to Dr. Joseph Mandiberg, an orthopedic surgeon, to perform an independent review of Goff's file to determine whether Goff suffered from any disabling conditions not subject to the 24-month mental disorder limitation. After reviewing the records, Dr. Mandiberg wrote on February 15, 2007, that Goff had no restrictions from a physical standpoint. He wrote that, based on the September 2005 FCE, Goff can go back to work as a "train engineer." (AR 378-382).

On March 16, 2007, Standard referred Goff's claim to another consulting physician, Dr. Hans Carlson, to review the medical information in the claim file. Dr. Carlson, a physiatrist, reviewed the medical records and concluded that Goff's physical injuries were stable by the end of 2005, and that Goff was capable of returning to light level work by March 14, 2006. This finding was consistent with Dr. Jones's notes and the FCE. (AR 362-372).

On April 9, 2007, the Administrative Review Unit issued an eleven page letter upholding the termination of Goff's benefits on March 15, 2007. Standard concluded:

> To summarize the results of our review, we find that Mr. Goff is not eligible for LTD Benefits beyond March 14, 2007 because he received the maximum benefit payable for his Mental Disorders, and because there is insufficient information to support that he has a non-limited Physical Disease or Injury that prevents him from working after March 14, 2007. Additionally, we find that he is physically able to return to work in his Own Occupation as Yard Engineer.

(AR 125). Goff then filed this action.

## II. STANDARD OF REVIEW

Where a plan gives the administrator "discretionary authority to determine eligibility for benefits," the court reviews the administrator's decision for an abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Here, the Plan provides Standard with discretionary authority to determine eligibility for benefits, and the parties agree that the abuse of discretion standard is applicable.

Under the abuse of discretion standard, the administrator's decision will be upheld if it is reasonable; that is, if it is supported by substantial evidence. *Fletcher-Merit v. Noram Energy Corp.*, 250 F. 3d 1174, 1179 (8th Cir. 2001). "While the administrator's decision need not be supported by a preponderance of the evidence, there must be 'more than a scintilla.'" *House v. Paul Revere Life Ins. Co.*, 241 F.3d 1045, 1048 (8th Cir. 2001) (citation omitted).

## III. ANALYSIS

Goff first contends that he is entitled to disability benefits based on his physical injuries alone. The record, however, does not show that the administrator abused its discretion when it denied benefits to Goff based on his physical injuries. This is true because all of Goff's treating physicians found that he was physically able to return to work as early as July 2005.

Dr. Keller and Bob White provide the only findings supporting Goff's claim that he is physically unable to work. Although Dr. Keller noted that Goff had certain physical limitations, he found that it was Goff's PTSD and emotional behavior, combined with the physical limitations, that precluded Goff from returning to his former job. Moreover, Dr. Keller did not rule out Goff returning to another occupation. Finally, White based his assessment of Goff's physical limitations on Goff's reporting, as opposed to actual testing, such as that done by Dr. Robertson.

It was not unreasonable for Standard to reject the conclusions of Dr. Keller and White in light of the opinions of Goff's treating physicians, Drs. Jones, Braden, Brophy, and Johnson. *See Rutledge v. Liberty Life Assur. Co. of Boston,* 481 F. 3d 655, 660 (8th Cir. 2007). Indeed, while Goff suffers from pain, there is insufficient evidence in the record to establish that the pain is disabling, in and of itself. Thus, Standard did not abuse its discretion in finding that Goff had no physical injuries after March 14, 2006, which prevented him from returning to work.

Goff's second argument is that the 24-month limitation on benefits is for disabilities caused by mental disorders or for disabilities to which mental disorders contributed. He argues that his physical disabilities were not caused by his mental disorders, but that his mental disorders were either caused by his physical injuries or, at least contributed to, by the physical injuries he suffered in the December 15, 2004, accident. Therefore, he argues, the 24-month limitation on benefits does not apply in this case.

The court finds Goff's argument intriguing. There appears to be no dispute Goff suffered from no disabling psychiatric or emotional disorders before his December, 2004, accident. It seems that, but for the horrendous accident, he would not have PTSD or depression. Goff's argument, however, is foreclosed by the plain language of the Plan and the Eighth Circuit's decision in *Brewer v. Lincoln Nat'l Life Ins. Co.*, 921 F. 2d 150 (8th Cir. 1990), *cert. denied*, 501 U. S. 1238 (1991). In *Brewer*, the court stated:

> The cause of a disease is a judgment for experts, while laymen know and understand symptoms. Laymen undoubtedly are aware that some mental illnesses are organically caused while others are not; however, they do not classify illnesses based on their origins. Instead, laypersons are inclined to focus on the symptoms of an illness; illnesses whose primary symptoms are depression, mood swings and unusual behavior are commonly characterized as mental illnesses regardless of their cause.

*Id.* at 154.

Thus, considering the cause of a mental disorder is not proper because a layperson classifies the illness by its symptoms, not its causes.[2] *See also Stauch v. UNISYS Corp.*, 24 F. 3d 1054 (8th Cir. 1994) (medical opinions concerning cause of mental illness not material; court properly focused on symptoms). Here, the overwhelming evidence is that Goff cannot work because of his PTSD, anxiety and depression. It is of no consequence that the physical injuries he suffered in the accident may have either caused or contributed to his mental disorders.

The plain language of the Plan removes any doubt that Standard properly applied the mental disorder limitation. The Plan states that the limitation applies to "mental, emotional, behavioral, psychological . . . abnormality, disorder, disturbance, dysfunction or syndrome, *regardless of cause . . . or the presence of physical symptoms*. (emphasis added). "Depression" and "anxiety" are considered mental disorders.

The record is replete with references to Goff's emotional and psychological problems hindering his ability to work. There is substantial evidence to support Standard's decision to apply the mental disorder limitation. In so doing, Standard did not abuse its discretion.

Third, Goff argues that the mental disorder limitation violates the Americans with Disabilities Act (ADA). While the Eighth Circuit has not addressed the issue, seven circuits have concluded that the ADA does not bar entities from offering different LTD benefits for mental and physical disabilities. *See EEOC v. Staten Island Savings Bank*, 207 F. 3d 144, 148 (2d Cir. 2000) (citing

---

[2]There is a split in the circuits as to whether a court may rely on a cause-based interpretation of illness to find ambiguity in an ERISA Plan. The Eighth and Fifth Circuits rely on symptoms rather than cause. The Seventh, Ninth and Eleventh Circuits hold that a cause-based interpretation is permissible. *See Fitts v. Unum Life Ins. Co. of America*, 520 F.3d 499, 501 (D. C. Cir. 2008) (discussing disagreement among circuits); *Billings v. Unum Life Ins. Co. of America*, 459 F. 3d 1088, 1094 (11th Cir. 2006) (same).

cases). Thus, the court can offer no redress on this argument.

## *IV. CONCLUSION*

For the reasons set forth above, the court finds that the administrator did not abuse its discretion in denying benefits to Goff because its decision is supported by substantial evidence. The court, therefore, affirms Defendants' decision to terminate Goff's LTD benefits effective March 15, 2007.

IT IS SO ORDERED this 11th day of August, 2008.

_____
UNITED STATES DISTRICT JUDGE